| | |
|---|---|
| **RYAN R. KINNERSON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-720** |
| **ARENA OFFSHORE, LP, ET AL** | **SECTION "L" (1)** |

## I.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises from injuries Plaintiff Ryan Kinnerson ("Kinnerson") sustained while being transferred in a personnel basket from a fixed offshore platform to the M/V Miss Claire. The basket was being lowered to the vessel by a temporary crane owned and operated by Defendant Sparrows Offshore, LLC's ("Sparrows"). Kinnerson alleges that, as the personnel basket approached the deck of the M/V Miss Claire, the deckhand located on the back deck of the M/V Miss Claire and serving as both the crane's signalman and rigger, grabbed the basket's tagline to control the basket's descent. When the deckhand grabbed the basket's tagline, the tagline broke, causing the deckhand to fall backward onto the vessel's deck. The deckhand's radio allegedly became inoperable during this incident, so the deckhand could no longer communicate with the Sparrows crane operator. The basket continued downward and landed on the vessel's railing. As the basket teetered on the railing, Kinnerson jumped out of the basket and onto the deck of the M/V Miss Claire, sustaining severe disabling personal injuries.

Kinnerson brought suit against several defendants, including Arena Offshore, LP ("Arena"), Sparrows, SeaTran Marine, LLC ("SeaTran"), and Paloma Energy Consultants, LP ("Paloma"). All of the Defendants except Sparrows settled with Kinnerson. Sparrows timely

1

answered and denies all allegations in Kinnerson's complaint. Sparrows avers that any injuries sustained by Kinnerson were caused by his own negligence or the negligence of others.

This matter came before the Court without a jury on August 26, 2019. The Court has carefully considered the testimony of all the witnesses, the exhibits entered into evidence during trial, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II.     FINDINGS OF FACT

1. On and prior to May 25, 2015, Kinnerson was employed by Oceaneering International, Inc. ("Oceaneering") as a technician aboard Arena's fixed offshore oil platform located on the Outer Continental Shelf in the Gulf of Mexico off the coast of Louisiana. The Arena platform was known as the Eugene Island 338 platform. *See* Tr. at 3 ll. 14–18; 8 ll. 10–12. *See also* R. Doc. 165 at 2.

2. Arena decided to drill a new well from the platform and hired several contractors to furnish services, personnel, and equipment to perform the drilling and construction work. Sparrows had a construction agreement with Arena to provide a crane with an operator during the construction work on the platform. R. Doc. 165 at 2.

3. SeaTran provided transportation services to and from the platform using its vessel, the M/V Miss Claire. R. Doc. 165 at 2.

4. Because of the construction work on the platform, the standard platform crane was moved, and a substitute temporary "Bullfrog" crane was being used to raise and lower men and equipment on and off the platform to the M/V Miss Claire. When a standard platform crane

is in operation, it is located near the edge of the platform so that the crane operator can see both what is on the deck of the platform and what is on the deck of the vessel below. The Bullfrog crane is much larger than the standard platform crane. It has a higher capacity (i.e. it could lift heavier weights) and was placed near the middle of the platform so that it could reach all sections of the platform and be used more efficiently in the construction operation. On this occasion, the Bullfrog crane was being used to transport men and equipment to the M/V Miss Claire. *See* R. Doc. 165 at 2; Tr. at 126 ll. 23–25, 127 ll. 1–4; Pl. Tr. Ex. 34 at 153 ll. 21–23.

5. The Bullfrog crane was being operated by Arnold Breaux, a Sparrows employee who was in the course and scope of his employment. Breaux is an experienced and certified crane operator. Tr. at 35 ll. 2–13, 72 ll. 15–25, 73 ll. 1–2.

6. The Captain of the M/V Miss Claire was Robert Weiss, an experienced and licensed captain employed by SeaTran. Dewey Palmer ("Palmer") was employed by SeaTran to serve as the deckhand on the vessel. Pl. Tr. Ex. 35 at 9 ll. 10–18, 10 ll. 4–16; Pl. Tr. Ex. 36 at 14 ll. 17–25, 15 l. 1.

7. The seas were six to eight feet, south-southwest and winds were 20 knots south-southwest. In preparation for the personnel basket transfer, Captain Weiss positioned his vessel with the starboard side to the platform. This position was reasonable, and the Captain held his position throughout the transfer. *See* Pl. Tr. Ex. 35 at 15 ll. 7–17, 21 ll. 5–23.

8. At approximately 3:45 p.m., Kinnerson and three other individuals climbed into the personnel basket, which at the time was located on the deck of the platform, so they could be lowered by the Bullfrog crane from the platform deck to the deck of the M/V Miss Claire. The deck of the platform was about 100 feet above the deck of the M/V Miss Claire.

9. Due to the Bullfrog crane's placement near the middle of the upper deck of the platform, the Bullfrog crane operator was not able to see the personnel basket once it went below a level about halfway between the platform deck and the vessel below. Tr. at 74 ll. 14–24, 75 ll. 15–19.

10. Because of the lack of visibility of the load going down from the platform, the transfer is known as a "blind lift." In a blind lift, it is necessary to have a signalman who can see both the platform and the deck of the vessel, so the crane operator can be guided in lowering the personnel basket in a safe and proper manner. This is particularly critical in rough seas and windy weather conditions, such as those that existed at the time of the transfer in question. *See* Tr. at 40 ll. 21–25, 41 ll. 1–8, 42 ll. 6–24.

11. In this instance, Palmer, the deckhand on the M/V Miss Claire, served as the sole signalman. There is conflicting testimony on this point, but the Court finds that the credible testimony (i.e. the testimony of Arnold Breaux, the crane operator, and Captain Robert Weiss) supports the conclusion that the sole signalman was the deckhand on the deck of the M/V Miss Claire. Although the deckhand could communicate with the crane operator by means of a handheld radio, they could not see each other. Furthermore, on this occasion, Palmer had a dual function: he was serving as a signalman directing the crane operator with a handheld VHF radio and, at the same time, he was serving as a rigger guiding the basket into a proper and safe location and helping the men to safely exit the basket. *See* Tr. at 42 ll. 14–24, 43 ll. 8–12.

12. The four men climbed into the personnel basket, which was located on the deck of the platform. Breaux, the crane operator, then lifted the basket off the deck of the platform,

swung it over the side of the platform, and began lowering it to the waiting vessel below. Tr. at 126 ll. 6–11, 127 ll. 1–8.

13. When the personnel basket was approximately 10 to 30 feet off the deck of the vessel— and out of sight of the crane operator—the deckhand reached up to catch the tagline attached to the bottom of the basket so that he could guide the basket to the proper space on the deck of the vessel. As he pulled on the tagline in an effort to guide the basket, the tagline—which was made of the wrong material and was in poor condition—broke and the deckhand fell backwards to the deck of the vessel. The personnel basket swung to the side of the vessel and hit the rail. The deckhand's radio was stored in his back pocket and when he got back up, he started yelling into the radio in an effort to stop the basket from descending. The deckhand then noticed the radio was inoperative, as apparently the radio battery had become dislodged at some point and the radio had ceased to function. Pl. Tr. Ex. 35 at 41 ll. 15–23, 42 ll. 18–25; Pl. Tr. Ex. 36 at 31 ll. 4–25, 32 ll. 1–21, 33 ll. 17–25, 61 ll. 11–19; Tr. at 127 ll. 1–12.

14. Due to the deckhand's radio becoming inoperable, he could not communicate with the crane operator and inform him about the broken tagline and the spinning and swaying basket. Pl. Tr. Ex. 36 at 61 ll. 4–24, 62 ll. 3–10.

15. The personnel basket struck the vessel's port railing and came to rest about four feet above the vessel's deck. As the basket teetered on the vessel's railing, Kinnerson and the other men quickly jumped to the vessel's deck. Kinnerson testified that he landed in a "twisted" position. Tr. at 127 ll. 9–22; Pl. Tr. Ex. 35 at 48 ll. 3–16; Pl. Tr. Ex. 36 at 62 ll. 11–18.

16. The Captain of the M/V Miss Claire, using the vessel's radio, told the crane operator that the men had gotten out of the basket but it "was a close call." The crane operator then raised

the basket back up to the deck of the platform and the vessel proceeded to take the men to shore. *See* Tr. at 66 ll. 12–23.

17. At the time of the incident and for a day thereafter, Kinnerson did not notice any significant pain or discomfort, but soon he began having pain in his neck and back. The pain in his back increased and he sought medical help. Kinnerson was initially seen on June 2, 2015 by Dr. Steven Guillory, Occupational Medicine Clinic ("OMC") on referral from Kinnerson's employer, Oceaneering. Pl. Tr. Ex. 23a at 8, 139–40.

18. Kinnerson's chief complaints at that time were to his lower cervical spine in the C6-7 and lower area, the right mid- to upper- thoracic muscle between the scapula and spine, and in the right trapezius muscle. Dr. Guillory's initial impression was cervical pain, non-radiating, right trapezius pain, lumbar muscle pain, non-radiating, and some difficulty sleeping. Dr. Guillory's plan consisted of hot and cold packs as directed, rest, and decreased activity, no lifting more than 20 pounds and return for follow up three days later (i.e., June 5, 2015). Pl. Tr. Ex. 23a at 8–10, 139–40.

19. Kinnerson returned to OMC on June 5, 2015. He complained of increasing discomfort in his lower and upper back between his scapula. He rated his pain as a 9 of 10 on a 1-10 scale. He also complained of spasms in his upper and lower back together with numbness and tingling which he attributed to his injury. Pl. Tr. Ex. 23a at 9–10, 153.

20. OMC's Dr. Tony Alleman ordered MRIs of Kinnerson's cervical, lumbar and thoracic spine. Pl. Tr. Ex. 23a at 156–57, 160.

21. Thoracic MRI imaging results obtained on June 10, 2015 at Imaging at Lafayette Surgical Specialty Hospital were interpreted by the radiologist, Dr. Jeffrey Laborde, as a T7-8 small central and left lateral focal disc herniation with no definite cord or nerve root pathology.

Pl. Tr. Ex. 23a at 171.

22. Kinnerson returned to OMC on June 15, 2015, with continuing complaints of discomfort and pain. He rated his pain as an 8 out of 10 on a scale of 1-10. He was not sleeping well due to pain and numbness, which he attributed to his injury. He stated that nothing stopped his pain. Pl. Tr. Ex. 23a at 11, 163.

23. Kinnerson was next seen on July 14, 2015 by Dr. Louis Blanda, Jr., Lafayette Bone and Joint Clinic, for evaluation of neck and back pain. Dr. Blanda testified by trial deposition. He summarized Kinnerson complaints on the July 14, 2015 visit as involving pain from the base of his neck to his tailbone and across his bilateral scapula region. He noted that Kinnerson's symptoms were aching and stabbing in nature; that Kinnerson described numbness, pins and needles sensation, and a burning pain; that Kinnerson rated his pain 10 on a scale of 0-10; that Kinnerson had numbness and a stabbing pain into his left posterior thigh; and that Kinnerson had a shooting pain and numbness into his left arm. Pl. Tr. Ex. 44 at 11, 15.

24. Kinnerson indicated to Dr. Blanda on this first visit that Kinnerson's pain was constant and increased with activity. Kinnerson told Dr. Blanda that he had difficulty sleeping; that coughing, sneezing, walking, and sitting aggravated his symptoms; that he got some relief with lying flat with a heating pad; that he did not have any history of prior injuries to his lower back; and that he worked one day (June 4, 2015) since the incident. Kinnerson told Dr. Blanda that he saw the doctor on June 5, 2015 and did not return to work after that. Pl. Tr. Ex. 44 at 15–16.

25. Dr. Blanda recommended that Kinnerson undergo a course of physical therapy; prescribed him Norco and Elavil; scheduled a return visit in 4-6 weeks; and placed Kinnerson on no-

work status. Kinnerson subsequently underwent a course of 12 physical therapy treatments by Fran Mancuso, PT, between July 27, 2015 and August 19, 2015. Pl. Tr. Ex. 44 at 17–18; Pl. Tr. Ex. 19.

26. Dr. Blanda next saw Kinnerson on August 25, 2015. At that point, Kinnerson had completed his 12-session physical therapy course. Dr. Blanda noted on this visit that the therapy was aggravating Kinnerson's condition. He summarized Kinnerson's pain complaints on this visit as pain in his mid- and lower thoracic region with bilateral radiating chest pain. In the thoracic spine, the pain was characterized as aching, constant, deep, diffused, and spasmodic. Causative factors included lifting, rising from a sitting position, rotating, standing and walking. Range of motion was restricted and presented with pain on motion. Inspection of the upper scapula area evidenced spasm bilaterally. Dr. Blanda felt the T7-T8 disc herniation could be responsible for Kinnerson's symptoms and ordered a T7-T8 thoracic epidural steroid injection. Pl. Tr. Ex. 44 at 18–22.

27. On September 17, 2015, Kinnerson underwent the thoracic epidural steroid injection, which was performed by Dr. Steven Staires at Lafayette Surgical Specialty Hospital. Pl. Tr. Ex. 44 at 102–03.

28. Kinnerson returned to see Dr. Blanda on October 6, 2015, at which time he reported that the injection provided no significant pain or physical relief. Dr. Blanda noted on physical exam that Kinnerson's mid- thoracic pain continued to radiate around the intercostal nerves. Kinnerson rated his pain as an 8 on a scale of 1-10. Dr. Blanda felt that surgery might be an option and recommended a Jewett brace at this visit. Pl. Tr. Ex. 44 at 22–23.

29. Kinnerson next saw Dr. Blanda for follow-up on December 10, 2015 with complaints of continued thoracic pain. On that visit, Dr. Blanda recommended continued conservative

treatment. Pl. Tr. Ex. 44 at 24–26.

30. Kinnerson saw Dr. Blanda again for follow-up on February 11, 2016 with continuing complaints of upper back pain. Kinnerson presented with headaches, tingling, burning, and anxiety. On physical exam both his neck and thoracic spine were tender. There was positive neck spasm and Spurling's test was positive to the shoulders on that visit. Dr. Blanda ordered another MRI of the thoracic spine. Pl. Tr. Ex. 44 at 26–29.

31. Kinnerson underwent his second thoracic MRI on February 18, 2016 at Imaging at Lafayette Surgical Specialty Hospital. The findings of the radiologist, Dr. Jeffrey Laborde, were as follows:

> *Impression:*
> **T7-T8**: Positive for a central and left lateral focal disc herniation with cord effacement.
> **T11-T12**: Positive for central disc herniation with superior extrusion.
>
> *Addendum: Images reviewed at physician's request.*
> MRI dated 2/18/16 is reviewed and reference is made to the central disc herniation at T11-12 with a superiorly extruded disc fragment.
> Compared to the prior study, now available dated 6/10/15, that disc herniation was present on that prior study. Please make reference to sagittal T2 image #8 and axial T2 image #42. The disc fragment has increased slightly in size and is now more prevalent on the 2/18/16.
> With regards to the T7-8 level, on the 6/10/15 study, sagittal T2 image #9 depicts the disc fragment that was described as 3-4 mm.
> On the 2/18/16 followup study, sagittal STIR image #9 identifies a 7-8mm disc fragment.
> Study indicates the disc fragment is enlarging.
>
> *Impression:*
> #1: The T7-8 disc herniation noted on 6/10/15 has increased in size on the followup study of 2/18/16.
> #2: The T11-12 disc herniation was present on 6/10/15 and has increased in size on the followup study of 2/18/16.

Pl. Tr. Ex. 17 at 19–20.

32. On February 25, 2016, Kinnerson returned for a follow-up with Dr. Blanda. Review of

Systems noted continued back pain, tingling, burning, depression and anxiety on physical exam. Dr. Blanda noted that Kinnerson's MRI looked worse with a T11-12 disc herniation with an extruded disc fragment. Dr. Blanda noted on physical exam that Kinnerson had pain and tenderness in his thoracolumbar area with pain radiating to his left flank and groin. Pl. Tr. Ex. 44 at 31, 37–39.

33. On March 12, 2016, Dr. Blanda's assistant, Evelyn H. Brown, recorded the following Addendum Note in Kinnerson's chart:

**Addendum Note** (Evelyn H. Brown; 3/12/2016)
On March 11, 2016, Dr. Blanda reviewed both thoracic MRIs. Per his handwritten notes, he indicates:
"*I reviewed both the 2-18-16 and 6-10-15 MRI'S of the thoracic spine. The T 11-12 disk pathology was present on the 6-10-15 MRI as well, but it is slightly larger on the 2-18-16 MRI. I feel that both abnormal disks are probably related to the 5-26-15 injury. We could have the radiologist re-read the 6-10-15 for comparison if needed.*"

*See* Pl. Tr. Ex. 44 at 40–41 (summarizing the note).

34. Kinnerson was next seen by Dr. Blanda on April 25, 2016. Kinnerson continued to complain of mid-back pain in the midline of the middle and low back area with symptoms of muscle cramping and radiating pain at times into the abdomen and left leg. Pl. Tr. Ex. 44 at 42–43.

35. Kinnerson returned to see Dr. Blanda on September 30, 2016, with continued complaints of pain in his mid- and low back region, together with radiating pain into both legs. He was also complaining of bilateral leg weakness at times. Pl. Tr. Ex. 44 at 46–47.

36. On his final visit to Dr. Blanda on November 29, 2016, Kinnerson continued to complain of pain in the mid- and low back region, with radiating pain into both legs and arms. Kinnerson also complained of muscle weakness, burning, pain, depression, and anxiety. Pl. Tr. Ex. 44 at 51–52.

37. Dr. Blanda subsequently referred Mr. Kinnerson to Dr. Alan Appley, neurosurgeon, for treatment. Pl. Tr. Ex. 44 at 54.

38. Dr. Appley, Kinnerson's treating neurosurgeon, testified by video deposition. Pl. Tr. Ex. 23a.

39. Dr. Appley initially saw Kinnerson for treatment on December 27, 2016 when Kinnerson came in with continued complaints of neck, upper back, shoulders and upper arms pain. Kinnerson's neck pain symptoms included arm and shoulder pain. The neck pain radiated to the right arm, left arm, right shoulder, left shoulder and between the shoulder blades. The pain was characterized as aching, stabbing, burning and tingling. Symptoms were exacerbated by prolonged standing (30 minutes) and sitting (30 minutes). Associated symptoms were arm numbness. Pl. Tr. Ex. 23a at 21, 23–24.

40. Kinnerson's mid-back pain radiated into the left greater than the right lower rib cage region. Intermittently, Kinnerson experienced shooting pain from the lower back into the left greater than the right lateral hips and interior/proximal thighs. There was also numbness into his legs in the same distribution. Subjectively, Kinnerson felt weakness into his bilateral lower extremities, which he especially noted when climbing stairs. Kinnerson also noticed increased mid-back pain when sneezing or taking a deep breath. Pl. Tr. Ex. 23a at 29.

41. Dr. Appley referred Kinnerson to Dr. Staires for T11 Thoracic Epidural Steroid Injection (TESI) and a bilateral TESI at T7-8. On March 2, 2017, Kinnerson underwent these thoracic epidural steroid injections by Dr. Staires at Lafayette Surgical Specialty Hospital. Pl. Tr. Ex. 21 at 4–5.

42. Dr. Appley subsequently saw Kinnerson in clinic on March 2, 2017; April 3, 2017; April

24, 2017; and May 1, 2017 with continuing complaints. *See* Pl. Tr. Ex. 23a at 42–46.

43. On June 29, 2017, Dr. Appley saw Kinnerson again, with the latter having continued complaints of mid-back, neck, bilateral shoulder, arm, and bilateral leg pain and a burning sensation in his arms between the shoulder blades. Pl. Tr. Ex. 23a at 47.

44. On July 5, 2017, Kinnerson was seen by Dr. Thomas Bertuccini, a neurosurgeon, for an IME for evaluation of Mr. Kinnerson's posterior cervical, interscapular and biscapular pain, low back and leg pain, and mid-back pain. Dr. Bertuccini recommended selective nerve root blocks. Def. Tr. Ex. 25 at 1–4.

45. Dr. Appley referred Kinnerson to Dr. Stephen Wyble at the Interventional Pain Clinic in Opelousas, Louisiana for the recommended nerve root blocks. On October 10, 2017, Dr. Wyble performed the nerve root blocks. Kinnerson obtained 24 hour pain relief from them, but the pain returned. Pl. Tr. Ex. 32a at 26, 29.

46. Dr. Wyble indicated in his treatment record that he opined Kinnerson's pain generators were located at the T7-8 and T11-12 discs and that he agreed with Dr. Appley that surgery was warranted at those two levels. *See* P. Tr. Ex. 32a at 28–29, 189, 199.

47. On February 28, 2018, upon Dr. Appley's order, a repeat thoracic MRI was performed at Imaging at Lafayette Surgical Specialty Hospital by Dr. Jeffrey Laborde. The resulting report stated the following:

> Prior examinations: compared to prior MRI-thoracic dated 2/18/16.
>
> MRI findings:
> T7-8: When compared to the prior study there [has] been no significant change to the central and left lateral focal disc herniation. 7-8 mm disc fragment remains that effaces the cord and still demonstrates a Central high intensity zone.
>
> T11-12: There has been significant enlargement of the central focal disc herniation. On the prior study, a fragment that measured 4 mm and L5 and 7 mm in width has considerably expanded to 12 mm in width 6 mm

And now extends cephalad by 1 cm.
Now appears to be 2-3 times larger. Slight left lateral predominance. Significant displacement and effacement of the left lateral cord.

Pl. Tr. Ex. 17 at 7–8.

48. Dr. Appley testified that after he received authorization from Oceaneering's worker's compensation carrier to proceed with surgery at the T7-8 and T11-12 levels, he scheduled Kinnerson for surgery. *See* Pl. Tr. Ex. 23a at 48–50.

49. Dr. Appley performed the surgery on Kinnerson at Lafayette General Medical Center on April 12, 2018. Dr. Appley's Operative Note of that date indicates that Kinnerson's Preoperative and Postoperative Diagnoses were Thoracic disk herniation with myelopathy and Thoracic disk herniation with radiculopathy. Pl. Tr. Ex. 23a at 52–53, 333.

50. The thoracic surgical procedure performed by Dr. Appley included: (1) Left T11- 12 anterior diskectomy with extended T11 partial corpectomy; (2) Left T11-12 arthrodesis with rib autograft; (3) Left T11-12 application of machined interbody device (cage); (4) Left T11-2 instrumentation of plates; (5) Left T7-8 diskectomy and interior lumbar interbody fusion with rib autograft; (6) Left T7-8 application of machined interbody device (cage); and (7) Left T7-8 instrumentation of plates. Pl. Tr. Ex. 23a at 333.

51. In Dr. Appley's professional medical opinion, as Kinnerson's treating neurosurgeon, it is more probable than not that the disc herniations in Kinnerson's thoracic spine occurred at the time of his injury on May 25, 2015 during the personnel basket transfer, progressively advancing both his structural and physical symptoms over time, and culminating in Thoracic disk herniation with myelopathy and Thoracic disk herniation with radiculopathy, as stated in Dr. Appley's operative report of 4/12/18. Pl. Tr. Ex. 23a at 77–79.

52. On February 11, 2019, Dr. Appley opined that Kinnerson may be a candidate for a dorsal

column stimulator. Pl. Tr. Ex. 23a at 76–77.

53. Thereafter, on April 10, 2019, Dr. Appley saw Kinnerson in clinic for follow-up. Dr. Appley noted Kinnerson's pain complaints on that visit to be burning pain in the mid-back with radiation around the rib cage on both sides; burning pain across the neck and upper back; lower back pain; and burning pain and tingling down his bilateral arms. Pl. Tr. Ex. 23a at 73–74.

54. Dr. Appley noted on that visit that Kinnerson remains limited in activity due to his symptoms. Dr. Appley also noted on that visit that Kinnerson was under the care of Dr. Wyble, an interventional pain management physician, for pain management; that Kinnerson was scheduled to see Dr. Bertuccini for an evaluation (IME) on April 15, 2019; and that Kinnerson was also scheduled for nerve conduction studies with Dr. Weir the following week. Pl. Tr. Ex. 23a at 74.

55. Kinnerson told Dr. Appley on that visit that Kinnerson and Dr. Wyble had discussed placement of a dorsal column stimulator and were planning a trial in the near future. Dr. Appley testified that he agreed with the recommendation for a dorsal column stimulator for Kinnerson's persistent neuropathic pain. Dr. Appley found on that visit that there was adequate epidural space through the operative site for placement of the stimulator leads. Pl. Tr. Ex. 23a at 74.

56. Dr. Appley noted on that visit that he would defer to Dr. Wyble regarding Kinnerson's future pain management medical treatment needs. Accordingly, on the April 10, 2019 visit, Dr. Appley discharged Kinnerson to Dr. Wyble's care. Dr. Appley noted that Kinnerson's follow-up with him could be on an as-needed basis. Pl. Tr. Ex. 23a at 74–75.

57. On April 12, 2019, Dr. Wyble saw Kinnerson in clinic for a follow-up. Dr. Wyble noted

on this visit that Kinnerson continues to have burning, shooting pain in his left (greater than right) chest wall. Dr. Wyble also noted that Kinnerson has mid- bilateral lower back pain, buttock pain and leg pain (left worse than right). Pl. Tr. Ex. 32a at 68 ll. 19–25, 69 ll. 1–3.

58. Dr. Wyble felt that Kinnerson's burning left chest wall pain was likely chronic neuropathic pain. Dr. Wyble discussed with Kinnerson his neuropathic chest pain and the risks and benefits of a Spinal Cord Stimulator trial. He also indicated he would get a neurological evaluation by Dr. Weir. Pl. Tr. Ex. 32a at 72 ll. 3–14.

59. On April 30, 2019, after Kinnerson advised Dr. Wyble that he wanted to proceed with the stimulator trial, Dr. Wyble implanted the trial spinal cord stimulator into Kinnerson's spine. Dr. Wyble testified at trial that his primary goal in recommending and implanting the stimulator was to achieve a decrease in Kinnerson's neuropathic pain, and to increase his quality of life. Pl. Tr. Ex. 32a at 80 ll. 12–13, 84 ll. 7–13.

60. Kinnerson returned to see Dr. Wyble after implantation of the trial spinal cord stimulator. Kinnerson obtained approximately 75 to 100 percent pain relief during the trial, more than 75 percent increase in function and activity during the trial, and reported better sleep. Kinnerson advised that he wanted to proceed with implantation of a permanent dorsal column stimulator. Pl. Tr. Ex. 32a at 86–87.

61. On June 6, 2019, Dr. Wyble implanted a permanent dorsal column stimulator. Pl. Tr. Ex. 32a at 88 ll. 3–4, 103 ll. 7–9.

62. During the June 27, 2019 follow-up, Dr. Wyble noted it had been three weeks since implanting the permanent stimulator, and that Kinnerson stated his thoracic, lower back and leg pain were much better with the stimulator. Kinnerson stated that his burning pain

and allodynia (in his left chest wall about the T7-9) were much better since the stimulator was implanted. Kinnerson also told Dr. Wyble that he had been able to reduce his narcotic use. Pl. Tr. Ex. 32a at 66, 93–95, 103.

63. However, now that this pain was better controlled, Kinnerson's neck pain was becoming more apparent. Kinnerson complained of neck pain with radiation into his arms on the right. Pl. Tr. Ex. 32a at 103 ll. 14–16, 140 ll. 1–8.

64. Testing indicates injuries to the cervical and lumbar area, which will likely need treatment when the thoracic area becomes more medically controlled. Pl. Tr. Ex. 25a at 36–42; Pl. Tr. Ex. 23a at 37–40.

65. In his June 27, 2019 report, regarding Kinnerson's work status, Dr. Wyble noted that Kinnerson has not worked since being injured offshore. Dr. Wyble also opined that Kinnerson would be at MMI July 18, 2019 for mid and lower back issues, but was undergoing workup for his cervical spine pain complaints. Dr. Wyble noted that due to the DCS (stimulator), Kinnerson had reduced his narcotic medication from 4 times per day to 2–3 times per day as needed. Pl. Tr. Ex. 32a at 297.

66. Dr. Wyble noted on the June 27, 2019 visit that Kinnerson had been seen by Dr. Weir for a neurological examination. Dr. Wyble noted that Dr. Weir had ordered an MRI of Kinnerson's C-spine and physical therapy. Dr. Wyble opined that Kinnerson could start PT for his cervical complaints eight weeks post-implantation of the permanent spinal cord stimulator. Pl. Tr. Ex. 32a at 103.

67. Also, during Kinnerson's follow-up of June 27, 2019, Dr. Wyble discussed with Kinnerson his previous and future work possibilities. Dr. Wyble noted that as a direct result of his severe injury of May 25, 2015, and the resulting two-level thoracic spine fusion and

continuing, chronic pain, he assigned Kinnerson an Impairment Rating of 30 percent. Dr. Wyble opined that Kinnerson had a severe injury resulting in life-long impairment and disability, and accordingly, Dr. Wyble noted that Kinnerson's work would be limited to sedentary activities. Pl. Tr. Ex. 32a at 96–98, 103 ll. 24–25, 104 ll. 1–6.

68. Dr. Wyble testified that Kinnerson's current diagnoses include: chronic pain syndrome, thoracic post laminectomy syndrome, depression/anxiety, insomnia, and neuropathic chest pain. Pl. Tr. Ex. 32a at 114 ll. 16–20.

69. Dr. Wyble also testified that it is his professional opinion, to a reasonable degree of medical certainty, that Kinnerson will need ongoing future pain management medical treatment for the remainder of his adult life. Accordingly, Dr. Wyble, upon consultation with Glenn M. Hebert, MRC, Kinnerson's Vocational Rehabilitation Consultant/Life Care Planner, provided Hebert written estimates of Kinnerson's future medical costs for pain management. Pl. Tr. Ex. 32a at 105–106, 147; Tr. at 186, 190.

70. Dr. David Weir, Kinnerson's treating neurologist, testified via video deposition. He initially saw Kinnerson on April 18, 2019 for neurologic examination and Bilateral Lower Extremity EMG/NCS and Thoracic Paraspinal EMG, upon referral by Dr. Wyble. Dr. Weir noted that Kinnerson complained predominantly of mid- to left and right lower thoracic pain (left worse than right) that radiated into the lower thoracic region and then into axilla extending to the left anterior axillary line. Kinnerson rated his pain a 7 out of 10. Kinnerson's pain in the thoracic region occasionally radiated into his lower back and into his buttocks and posterior legs and calf region bilaterally and occasionally into his right foot. Further, Kinnerson had occasional lower neck and scapular pain that extended into his arms and the fifth digit of both arms. Kinnerson described that pain as being 2-3 out of

10. Pl. Tr. Ex. 25a at 31 ll. 20–25, 23 ll. 1–25, 24 ll. 1–5; Pl. Tr. Ex. 32a at 76 ll. 4–24.

71. After performing a neurological examination on Kinnerson, Dr. Weir then performed diagnostic testing consisting of Bilateral Lower Extremity EMG/NCS and Thoracic Paraspinal EMG. Dr. Weir testified that the results of these tests demonstrate acute Left T11-12 thoracic radiculopathy with fibrillation potentials, with positive sharp waves and complex repetitive discharges identified on needle EMG exam; and Chronic neuropathic changes consistent with broad duration, high amplitude, polyphasic units on the left at T11-12. Pl. Tr. Ex. 25a at 21 ll. 8–25; Pl. Tr. Ex. 32a at 76 ll. 6–18.

72. Dr. Weir found these findings consistent with both acute and chronic radiculopathy at the T11-12 level, and he felt the findings were responsible for Kinnerson's pain generator radiating into his axilla on the left to the anterior axilla area of the left chest wall. Dr. Weir recommended that Kinnerson continue pain management with Dr. Wyble, and that Kinnerson follow-up with Dr. Weir for re-evaluation and additional recommendations depending on the results of the spinal cord stimulator. Dr. Weir relates Kinnerson's condition to the May 25, 2015 incident. Pl. Tr. Ex. 25a at 23 ll. 19–25, 24 ll. 5–8, 29 ll. 6–12, 18–22, 45 ll. 23–25, 46 ll. 1–11.

73. This Court finds credible the medical testimony adduced by Kinnerson, indicating that the abnormalities appreciated on his various diagnostic testing were a result of Kinnerson's thoracic spine injuries, which resulted from the May 25, 2015 incident.

### III.    CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1333. Furthermore, this is an admiralty and maritime claim falling within the purview of Rule 9(h) of the Federal Rules of Civil Procedure. Venue is proper in the Western District of Louisiana.

2. This case involves incidents which occurred both on a fixed offshore platform located on the outer continent shelf off the coast of Louisiana and on a vessel floating in navigable waters adjacent to the platform. Since the injuries that gives rise to this lawsuit occurred on the vessel, the substantive law applicable to this case is general maritime law. *See, e.g. Hamm v. Island Operating Co.*, 450 F. App'x 365, 368 (5th Cir. 2011); *Strong v. B.P. Expl. & Prod.*, 440 F.3d 665, 669 (5th Cir. 2006). The only other potentially applicable substantive law is the law of Louisiana, and the principles of negligence under Louisiana law are virtually identical to those of general maritime law.

3. "The analysis of a maritime tort is guided by general principles of negligence law." *In re Signal Intern, LLC*, 579 F. 3d 478, 491 (5th Cir. 2009) (quoting *Consol. Aluminum Corp. v. C. F. Bean Corp.*, 833 F. 2d 65, 67 (5th Cir. 1987). Thus, to establish maritime negligence, a plaintiff must demonstrate that the defendant owed a duty to the plaintiff, the defendant breached that duty, the plaintiff sustained an injury, and there is a causal connection between the defendant's conduct and the plaintiff's injury. *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir 2000). Furthermore, the resultant harm must be reasonably foreseeable. *See Thomas v. Express Boat Co.*, 759 F 2d 444, 448 (5th Cir. 1985). Duty varies depending upon the facts, circumstances, and context of each case, and it is limited by the particular risks, harm, and parties involved. Nevertheless, there is an almost universal duty in negligence cases to use reasonable care so as to avoid injury to another. Further, the owner or operator of a machine, such as a crane, has the duty of exercising reasonable care for the safety of the persons being transported by the device and the duty not to expose such persons to unreasonable risks of injury or harm. Whether a defendant breached a duty and whether that breach was a cause-in-fact of a plaintiff's injuries are

factual questions to be determined by the fact finder.

4.  In the present case, the crane operator designated the crew member on the vessel to serve as the sole signalman. The crew member was not in view of the crane operator. Moreover, the crew member had to serve in a dual capacity as a rigger with the responsibility of physically positioning the basket in a safe location on the vessel's deck and helping the passengers to safely exit from the basket. The evidence supports the conclusion that the signalman should have been in clear sight of the crane operator and have the sole function of guiding the basket to a safe location on the vessel. The crane operator did not follow this procedure and as a result, the incident in question occurred and the plaintiff was injured. Accordingly, the Court finds that the proximate cause of the plaintiff's injury was the crane operator's failure to have a signalman positioned on the platform who could see both the crane operator and the basket as it was being lowered to the vessel. If there had been such a signalman, he could have given the stop signal to the crane operator as soon as the tagline parted and caused the crew member to fall. The basket's descent would have immediately stopped, and the basket would have remained suspended above the vessel's deck and would not have come in contact with the port rail. The crane operator could then have either raised the basket back to the deck of the platform or, with the help of the deckhand (when he got back on his feet), lowered the basket to a safe place on the deck of the vessel so that the passengers could safely exit from the basket.

5.  At trial the crane operator was directed to a section of a company manual for crane operators which provided "when operations are required to be controlled by signals, a designated signal person should be assigned to work with the crane....and be in clear view of the crane operator to ensure that their signals may be seen". He was then asked the

following:

Q. And in this case here, who was your signalman?

A. The deckhand on the boat.

Q. Right. So he was not in clear view of you, was he?

A. No, sir.

Tr. at 42 ll. 6–17.

His testimony continued:

Q. But you didn't have a designated signalman . . . on the platform who could actually see you and see the load being transferred and could see the bottom deck of the vessel?

A. No, sir.

Q. You didn't have that?

A. No, sir.

Q. So you violated this particular rule here, didn't you?

A. Yes, sir.

Tr. at 43 ll. 11–20.

6. General maritime law provides for the imposition of vicarious liability upon employers whose employees cause injury through negligent actions or inactions while in the course of their employment. *See Stoot v. D & D Catering Serv.*, 807 F2d 1197, 1199 (5th Cir. 1987). In this case, the failure of the crane operator to provide a proper signalman was a negligent inaction. This failure occurred in the course of the crane operator's employment with Sparrows. Thus, Sparrows is liable for the resulting damages sustained by Kinnerson.

7. There is evidence that the tag was constructed of improper material (hemp instead of nylon) and that it was in poor shape. The defendant argues that the plaintiff should have noticed

the poor condition of the tagline and that his failure to observe this and take evasive action was negligence on his part. The tagline was attached to the bottom of the personnel basket and it was underneath the basket as it rested on the deck of the platform when the men boarded the basket. It is doubtful that any of the men who climbed into the basket had any opportunity to observe the tagline before they boarded the basket. The crane operator was the one who should have inspected the tagline, as well as the basket, before allowing the men to get into the basket. If there was any negligence associated with the tagline, it must be borne by the crane operator, as it was his duty to ensure that the basket—which was in his control—was in a safe condition. In any event, any negligence associated with the tagline was not the proximate cause of the Kinnerson's injuries. The proximate cause of Kinnerson's injuries was the failure to have a signalman on the platform who could see both the crane operator and the deck of the M/V Miss Claire. Had there been such a signalman, he would have seen the crew member fall to the deck and immediately signaled the crane operator to stop the basket's descent, and the incident in question would not have happened.

8. Under general maritime law, an injured worker is entitled to monetary recovery for past and present wages and the loss of future earning capacity, past, present, and future medical expenses, and past, present, and future pain and suffering caused by negligence. 1 Thomas J Schoenbaum, Admiralty and Maritime Law, §§ 5:8 and 6:18 (6th ed. 2018).

9. An award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability to engage in those activities that normally contribute to the enjoyment of life. 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, §§ 5:8 and 6:18.4 (6th ed. 2018).

10. As a direct result of this incident, Kinnerson sustained significant injuries, including injuries to his intervertebral disc at levels T7-8 and T11-12. These injuries necessitated several surgical procedures, including the permanent implantation of a dorsal column stimulator. Additionally, he has sustained injuries to his cervical and lumbar discs that are likely to need some surgical intervention in the future. Kinnerson has been in constant pain since shortly after the incident and the pain is likely to persist in the future. His past medical expenses total $171,188.57. Pl. Ex. 43 at 3. His future medical expenses (over his future life expectancy of 47 years) are projected to be $1,109,039. Pl. Ex. 46 at 3.

11. Kinnerson was born on November 13, 1987. He was 27 years old at the time of his injury. Prior to working for Oceaneering, Kinnerson completed two years of college at Southern A&M University. Thereafter, he attended T. H. Harris Vocational Technical School, where he completed a two-year program in Nondestructive Testing, finishing in 2009. This type of work is highly regarded and necessary in oil fields where pipes need to be tested after welding to ensure their safe condition. Upon completing the T. H. Harris program, Kinnerson was classified as a Non-Destructive Tester, Level II (NDT Level II). He was also certified as an NDT Level II with Oceaneering and with his prior employer, Bayou Testers. Kinnerson also holds a Dual Radiation Safety Certification In Gamma and X-Ray. At the time of his injury he was earning $22.00 per hour with time and half overtime. His employment records indicate that he traditionally works a considerable amount of overtime, which is a hallmark of a serious-minded and hard-working employee. In the year prior to his injury, he earned $95,689.00 before reduction for taxes plus fringe benefits and meals. Pl. Ex. 46 at 1–2. Kinnerson has enough experience to qualify for an NDT III, but he would have to pass a test administered by the American Society for Non Destructive

Testing. His brother is an API inspector, which is a top-level pipe inspector. Kinnerson testified that his ambition and employment goal is to become an API inspector and work with his brother. Tr. 120 at ll. 2–4, 17–19.

12. Kinnerson's education, skill and work history suggests that it is more likely than not that he would have advanced in his career. The measure of future loss of wages is the loss of earning capacity, which is not necessarily determined by past earned wage. *See, e.g. Barocco v. Ennis Inc. of Colorado*, No. CIV.A.02-1450, 2003 WL 1342973, at *1 (E.D. La. Mar. 19, 2003), *aff'd sub nom. Barocco v. Ennis Inc.*, 100 F. App'x 965 (5th Cir. 2004) ("The award is based on earning capacity, not on what the plaintiff actually earned before and after the accident."); *Rea v. Wisconsin Coach Lines, Inc.*, No. CIV.A. 12-1252, 2014 WL 5039591, at *3 (E.D. La. Oct. 8, 2014); *Hobgood v. Aucoin*, 574 So. 2d 344, 346 (La. 1990) ("Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury."). This is particularly true for a young person. For a young person who through his work history proves to be hard working, ambitious, with high goals and aspirations, it is appropriate to consider other factors in addition to past wages, such as his interests, education, past work track record, and ability to achieve his goals. The next step in Kinnerson's work journey would be NDT III inspector. *See* Tr. 120 at ll. 5–11. True, his ultimate goal was to achieve the work level of his older brother, but this would take considerable time and job availability and be too speculative to serve as the basis for determining future wage loss. On the other hand, an NDT Level III job was within close reach. Kinnerson had completed the work requirements for this position and only needed an entrance test which, based on his education and work experience, would likely not be a high hurdle. The evidence supports the conclusion that

there is a plethora of NDT Level III jobs available in both the offshore and onshore oil industry, so the Court will utilize wages for this position as the basis for future loss of wage. Nevertheless, in computing the Plaintiff's past losses, the Court concludes that the evidence supports that it would have taken the Plaintiff one year to complete his test requirements and transition to the job of an NDT III inspector, with a base salary of $130,000 annually, pre-tax. *See* Pl. Ex. 46. During this one-year period of time before the increase to a base salary of $130,000 annually, his loss of past wage will be based on the wage he earned as an NDT II ($95,689). Therefore, the Court calculates Kinnerson's loss of past wages, fringe benefits, and meals using his $130,000 annual pre-tax salary for 3.25 years and using his $95,689 annual pre-tax salary for 1 year. The Court notes that Mr. Theriot's report calculates past loss and future loss damages post-tax, which is what the Court uses in its calculations.

In determining future wage loss, it is necessary to consider whether and to what extent the plaintiff can return to some gainful employment because an injured party must seek to minimize his damages. The opportunities for the Plaintiff in this case to return to gainful employment are limited at best. He has undergone several operations and has a permanent stimulator to reduce the pain in his thoracic spine. He cannot bend, stoop, run, jump, stand or sit for long periods. He is likely to have permanent pain that will require medication and he will have to undergo several more surgical procedures on his cervical and lumbar spine. Most people would not seek or be able to do any work, but this plaintiff has proven himself to be exceptional in his capacity to rise above his pain and disability. He does what he can and with his education and drive, he will likely do some type of sedentary work at least on a restrictive and limited basis. As such, the Court calculates his

future wage loss using a pre-injury earnings base of $130,000 annually pre-tax with a return to work assumption of $7,852 annually pre-tax. *See* Pl. Ex. 46.

13. Based on the above factors the court finds the plaintiff's wage loss, post-taxes, *see* Pl. Ex. 46, to be the following:

| | |
|---|---|
| Past loss wages, fringe benefits and meals | $469,875.76 |
| Future loss of wage earning capacity, fringe benefits and meals | $2,760,014 |

14. In addition to medical expenses and wage loss, Kinnerson is entitled to damages for the pain and suffering he has sustained and will sustain in the future that reflect the evidence regarding the nature, severity and duration of his injuries, including the following: the severe spinal injuries he sustained to three regions of his spine–cervical, thoracic, and lumbar and the discs therein; the non-segmental fusion surgeries he underwent at T7-8 and T11-12; the implantation of a trial and permanent dorsal column stimulators; several spinal injections; nerve root blocks; the exhaustive conservative treatment he has undergone and will, in the future, undergo; chronic nerve damage at T11-12; bilateral ulna nerve entrapment; the fact that he lives every day with chronic, unremitting pain; the multiple surgical procedures he will have to undergo in the future to replace the battery for the dorsal column stimulator and to repair or stabilize his cervical and lumbar discs; the lifelong extensive medication regime he will endure; the impact the incident and injuries have taken on his marital and personal life; and the psychological and emotional toll, documented depression and sleep disorders. Considering Kinnerson's young age at the time of the incident (27) and the likelihood that he will suffer for the remainder of his life expectancy of 47 years, the Court concludes that an appropriate award of general damages for past, present and future physical pain and suffering, mental anguish, loss of enjoyment of life

and permanent disabilities is $1,300,000, with $400,000 for past and $900,000 for future.

The Fifth Circuit has concluded "[t]he trial court has great latitude in assessing damages" and "[a]wards for pain and suffering must necessarily depend to a great extent on the trial court's observations." *Parks v. Dowell Div. of Dow Chem. Corp.*, 712 F.2d 154, 160 (5th Cir. 1983). Moreover, the Fifth Circuit has held it will only reverse an allegedly excessive damages award on the "strongest of showings" and it will "decline to reduce the damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Ledet v. Smith Marine Towing Corp.*, 455 F. App'x 417, 422 (5th Cir. 2011) (internal citations omitted). Although there are relatively few cases from Louisiana involving similar circumstances and injuries as the ones Kinnerson suffered, the Court concludes this award is consistent with Fifth Circuit jurisprudence in cases with suitable comparators. *See id.* at 420–21, 423 (affirming the district court's award of $300,000 for past pain and suffering and $1,000,000 for future pain and suffering for a plaintiff who suffered compression fractures to his T12 and L1 vertebrae, edemea, underwent a three-level surgical fusion, and still experienced a significant amount of pain). *See also Hale v. Wood Grp. PSN*, No. CV 6:15-1803, 2018 WL 4609453, at *7 (W.D. La. Sept. 25, 2018), *aff'd,* 769 F. App'x 113 (5th Cir. 2019), *reh'g denied* (May 22, 2019) ("Hale's injuries, and the attendant pain and suffering and loss of enjoyment of life resulting from those injuries, are much more severe than those reflected by the facts of the cases the defendants have cited. Besides the constant, often debilitating, pain that Hale must endure, and which will likely never improve, he faces potential future surgeries . . . Hale's other treatment options, if Hale declines his surgery alternatives on the basis of risk versus reward, were to undergo, for

his lifetime, chronic pain management consisting of the insertion of an intrathecal pump to transmit narcotics directly into his spinal fluid, or the placement of a spinal cord stimulator to interfere with the pain signals sent to his brain, or undergo up to three epidural steroid injections a year for the remainder of his lifetime . . . Thus, when considering the totality of the plaintiff's injuries in this case, the Court is unable to conclude that the jury's verdict "shocks the conscience" or that the jury's general damages award was excessive.").

15. This is an admiralty or maritime case and an award of prejudgment interest on Plaintiff's past losses is appropriate. *See Manson Gulf, L.L.C. v. Lafleur*, No. 18-31071, 2019 WL 4124431, at *3 (5th Cir. Aug. 29, 2019).

## IV.    SUMMARY

On the basis of the foregoing Findings of Facts and Conclusions of Law, the Court finds that Plaintiff Ryan Kinnerson has sustained injuries and damages due to Defendant Sparrows Offshore, LLC's negligence. Accordingly, Plaintiff is entitled to recover from Sparrows Offshore, LLC the following damages:

| | |
|---|---|
| (a) Past medical expenses | $171,188.57 |
| (b) Future medical expenses | $1,109,039 |
| (c) Past loss wages, fringe benefits and meals | $469,875.76 |
| (d) Future loss of wage earning capacity, fringe benefits and meals | $2,760,014 |
| (e) Past physical pain and suffering, mental anguish, and loss of enjoyment of life | $400,000 |
| (f) Future physical pain and suffering, mental anguish, and loss of enjoyment of life and permanent disabilities | $900,000 |
| TOTAL | $5,810,117.33 |

Additionally, Plaintiff is entitled to prejudgment interest running from the date of judicial

demand through the date of Judgment on the above-mentioned past damages at the federal judicial rate. Moreover, the Court awards post-judgment interest on the total award amount at the federal judicial rate until paid.

New Orleans, Louisiana this 13th day of September, 2019.

UNITED STATES DISTRICT JUDGE